**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

CHAD MCCLURE,

      Plaintiff,

    v.

A. HYERS, et al.,

      Defendants.

CIVIL ACTION NO.: 5:18-cv-32

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Guy Augustin, K. Bell, D. Cox, A. Hyers, A. Johnson, and D. Stewart's ("Medical Defendants") Motion for Summary Judgment, doc. 83; and Hilton Hall and Ricky Stone's ("Nonmedical Defendants") Motion for Summary Judgment, doc. 80. For the reasons below, I **RECOMMEND** the Court **GRANT** Defendants' Motions, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff leave to proceed *in forma pauperis* on appeal.

## BACKGROUND

Plaintiff brought this 42 U.S.C. § 1983 action relating to his medical treatment while incarcerated at Coffee Correctional Facility in Nicholls, Georgia. Doc. 1. Plaintiff filed an Amended Complaint on September 11, 2018. Doc. 10. After conducting frivolity review, the Court dismissed Plaintiff's due process and equal protection claims. Doc. 16. On September 13, 2019, Defendant Sharon Lewis filed a motion to dismiss. Doc. 32. On October 9, 2019, Plaintiff requested leave to file an Amended Complaint. Doc. 42. On April 7, 2020, Nonmedical Defendants filed a Motion for Summary Judgment. Doc. 80. On April 22, 2020, Medical

Defendants filed a separate Motion for Summary Judgment. Doc. 83. On September 1, 2020, the Court granted Plaintiff's Motion to Amend his Complaint and directed the Clerk of Court to create a separate docket entry for Plaintiff's Second Amdended Complaint. Doc. 90.

The Court then conducted frivolity review of Plaintiff's Second Amended Complaint and granted Defendant Lewis' motion to dismiss. Docs. 91, 96. As a result, the Court dismissed all claims asserted against Defendants Dozier, Sauls, Correct Care Solutions, and Lewis. Id. Thus, the only claims remaining are an Eighth Amendment claim against Defendants Hyers, Augustin, Arebeck, Cox, Johnson, Bell, and Stewart (the Medical Defendants) and an Eighth Amendment claim against Defendants Hall and Stone (the Nonmedical Defendants). These Defendants now move for summary judgment on these pending claims.[1]

---

[1] One procedural aspect of this case warrants clarification. Defendants filed the two instant Motions for Summary Judgment while Plaintiff's motion for leave to file a second amended complaint was pending. The Court has since granted Plaintiff's motion to amend, and Plaintiff's Second Amended Complaint is now the operative pleading. Doc. 89. The timing of these developments is immaterial to the matters now before the Court. Plaintiff's Second Amended Complaint did not alter Plaintiff's claims against the Medical and Nonmedical Defendants or the legal bases for those claims in any significant way. Rather, as to these claims, Plaintiff merely added a few additional allegations about the care he received after he initiated this suit. See Doc. 90 at 9–13 (describing treatment between April 6, 2018 and September 12, 2019). Medical Defendants fully address these facts in their Motion for Summary Judgment. Doc. 83-2 at 7–10. And these additional facts are immaterial to Nonmedical Defendant's Motion for Summary Judgment. Doc. 80 (arguing failure to exhaust administrative remedies, deliberate indifference claim fails as a matter of law, supervisory liability claim fails as a matter of law, and supervision and training claim fails as a matter of law). Furthermore, in responding to Defendants' Motions, Plaintiff elected to rely on certain pieces of documentary evidence, his declarations, and some allegations in his Amended Complaint and Second Amended Complaint. Docs. 86 at 2–4; Doc. 87 at 2–3. Generally, a plaintiff responding to an appropriately supported motion for summary judgment may not rely solely on allegations in a complaint. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) ("In response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations,' but must "set forth" by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true."). However, where appropriate, the Court has properly credited Plaintiff's sworn factual allegations in his Complaints. See Gooden v. Internal Revenue Serv., 679 F. App'x 958, 961 (11th Cir. 2017) (recognizing sworn factual allegations in a complaint may be considered in ruling on a motion for summary judgment). In light of these circumstances, the Court may now consider Defendants' Motions for Summary Judgment.

## UNDISPUTED, MATERIAL FACTS[2]

### I.    Medical Defendants[3]

Plaintiff attempted to steal the ball from an opposing player during a basketball game at Coffee Correctional Facility ("CCF") on December 6, 2016.  Doc. 83-1 at 1; Doc. 87 at 2.  When the opposing player pulled the ball in, Plaintiff's hand was still on the ball.  Doc. 83-1 at 1; Doc. 87 at 2.  Plaintiff states the force of his body's momentum going one direction and his hand on the basketball going the opposite direction caused his shoulder to dislocate.  Doc. 83-1 at 1; Doc. 87 at 2.

On the same day as the injury, CCF Nurse Kyla Hand saw Plaintiff in the medical department.  Doc. 83-1 at 1; Doc. 87 at 2.  She gave Plaintiff a 600 mg ibuprofen and put Plaintiff's arm in a sling.  Doc. 83-1 at 1; Doc. 87 at 2.  Based on the December 6, 2016 examination of Plaintiff's shoulder, there was no swelling or discoloration of Plaintiff's shoulder. Doc. 83-1 at 1; Doc. 87 at 2.  He was able to wiggle his fingers and rotate his wrist.  Doc. 83-1 at 1; Doc. 87 at 2.  Plaintiff saw Nurse Practitioner McLeod and Dr. Augustin the same day, and his shoulder was put back into place.  Doc. 83-1 at 2; Doc. 87 at 2.  Ms. McLeod specifically instructed Plaintiff to take caution in performing activities that may cause future injury to his shoulder and told Plaintiff injuring his shoulder would be easier in the future.  Doc. 83-1 at 2;

---

[2]    The recited facts represent the facts in the record and draw all reasonable inferences in the light most favorable to Plaintiff, the non-moving party.  See Peppers v. Cobb County, 835 F.3d 1289, 1295 (11th Cir. 2016).  Medical Defendants and Nonmedical Defendants each moved for summary judgment separately and have submitted separate Statements of Facts.  Docs. 83, 80.  Thus, the Court has split this section into two subsections representing the undisputed, material facts set forth by each group of Defendants.

[3]    In his Response, Plaintiff states he only disputes Medical Defendants' assertion he never dislocated his right shoulder and the Medical Defendants' claim there is no medical evidence to support the dislocation.  Doc. 87 at 2.  Plaintiff does not dispute any of the remaining facts set forth in Medical Defendants' statement of facts.  See Local R. 26.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.").

Doc. 87 at 2.  As a result of the alleged injury, an x-ray was performed on December 13, 2016.

Doc. 83-1 at 2; Doc. 87 at 2.  The x-ray report stated there is "no change indicating fracture,

dislocation, or lytic or blastic lesions of the right shoulder" and "the soft tissues are intact."

Doc. 83-1 at 2; Doc. 87 at 2.  The report also states the x-ray shows a "normal right shoulder."

Doc. 83-1 at 2; Doc. 87 at 2.  Plaintiff had no issues with his shoulder from the date of the injury

(December 6, 2016) for next five months.  Doc. 83-1 at 2; Doc. 87 at 2.

On May 20, 2017, Plaintiff angrily threw a piece of paper into a trash can, which violated

Ms. McLeod's instruction Plaintiff not perform actions which could cause Plaintiff's shoulder to

be injured again.  Doc. 83-1 at 2; Doc. 87 at 2.  Though Plaintiff states his shoulder briefly slid

out of place, he immediately lifted his arm and his shoulder slid back into alignment.  Doc. 83-1

at 2; Doc. 87 at 2.  Plaintiff saw Defendant Nurse Audra Johnson on May 23, 2017.  Doc. 83-1 at

3; Doc. 87 at 2.  Plaintiff was able to rotate his arm and raise his arm above his shoulder.

Doc. 83-1 at 3; Doc. 87 at 2.  There were no signs of swelling, edema, or deformity to Plaintiff's

right shoulder on this date.  Doc. 83-1 at 3; Doc. 87 at 2.  Defendant Johnson consulted with

Defendant Augustin, and Plaintiff was prescribed 600 mg of ibuprofen and another x-ray was

ordered.  Doc. 83-1 at 3; Doc. 87 at 2.  Plaintiff was counseled and educated on using light

exercises to help strengthen muscles to prevent further injury to the shoulder.  Doc. 83-1 at 3;

Doc. 87 at 2.

Plaintiff was scheduled to see a provider for follow-up.  Doc. 83-1 at 3; Doc. 87 at 2.

Though Plaintiff was apparently scheduled to see a provider a week after the May 23, 2017 visit,

his appointment was canceled.  Doc. 83-1 at 3; Doc. 87 at 2.  The medical staff informed

Plaintiff an appointment would be rescheduled after the medical staff received the x-ray results.

Doc. 83-1 at 3; Doc. 87 at 2.  The May 23, 2017 x-ray was read the same as Plaintiff's first shoulder x-ray and revealed a "normal right shoulder."  Doc. 83-1 at 3; Doc. 87 at 2.

Plaintiff's appointment was rescheduled for June 14, 2017, when he was seen by Nurse Practitioner Sebrina Taylor.  Doc. 83-1 at 4; Doc. 87 at 2.  Plaintiff complained to Ms. Taylor of a right shoulder "dislocation" but informed her he was able to put his shoulder back in place himself.  Doc. 83-1 at 4; Doc. 87 at 2.  Ms. Taylor also discussed Plaintiff's x-ray with him, which was normal. Doc. 83-1 at 4; Doc. 87 at 2.  Ms. Taylor made a notation suggesting the possibility of requesting an MRI or CT scan for Plaintiff's shoulder.  Doc. 83-1 at 4; Doc. 87 at 2.  Ms. Taylor prescribed Plaintiff Motrin for a month and ordered a follow-up appointment, which was set for July 25, 2017.  Doc. 83-1 at 4; Doc. 87 at 2.  At this appointment, Plaintiff still complained of right shoulder pain, though he had full range adduction.  Doc. 83-1 at 4; Doc. 87 at 2.  Ms. Taylor again prescribed Motrin and noted she informed Plaintiff "a consult for an MRI will be done at this time; however, it must be approved."  Doc. 83-1 at 4; Doc. 87 at 2.

Plaintiff then saw Defendant Nurse Audra Johnson on August 30, 2017.  Doc. 83-1 at 4; Doc. 87 at 2.  Plaintiff informed Nurse Johnson at this visit his right shoulder was still hurting and a provider had told him "she was going to put [him] down for an MRI."  Doc. 83-1 at 4; Doc. 87 at 2.  Plaintiff's medical chart and other records do not show Plaintiff was ordered, scheduled, or approved for an MRI consult.  Doc. 83-1 at 5; Doc. 87 at 2.  Nurse Johnson consulted with Dr. Augustin on August 30, 2017, who prescribed 375 mg of naproxen for 30 days with two refills.  Doc. 83-1 at 5; Doc. 87 at 2.

Plaintiff saw Dr. Augustin on October 30, 2017.  Doc. 83-1 at 5; Doc. 87 at 2.  Dr. Augustin noted Plaintiff's x-rays were normal, and he had no gross sensory, motor deficit, or gross deformity, which Dr. Augustin noted in Plaintiff's medical chart.  Doc. 83-1 at 5; Doc. 87

at 2.  Dr. Augustin diagnosed Plaintiff with myalgia and increased his naproxen dosage for 30 days with a refill.  Doc. 83-1 at 5; Doc. 87 at 2.  Dr. Augustin's notes do not indicate an MRI was ordered or that Plaintiff needed one.  Doc. 83-1 at 5; Doc. 87 at 2.

Plaintiff saw Nurse Practitioner Sebrina Taylor again on December 12, 2017.  Doc. 83-1 at 5; Doc. 87 at 2.  However, the medical records surrounding this visit do not mention an MRI. Doc. 83-1 at 5; Doc. 87 at 2.  Ms. Taylor noted there was no abnormality after a full shoulder examination.  Doc. 83-1 at 5; Doc. 87 at 2.  Ms. Taylor ordered Plaintiff continue on Motrin, and she discussed this plan of care with Plaintiff.  Doc. 83-1 at 6; Doc. 87 at 2.  After the December 12, 2017 appointment, Plaintiff went at least four months without any issues with his right shoulder.  Doc. 83-1 at 6; Doc. 87 at 2.

On April 6, 2018, Plaintiff submitted a Healthcare Services Request Form ("HSRF"), requesting a bottom bunk profile as a result of his right shoulder.  Doc. 83-1 at 6; Doc. 87 at 2. Registered Nurse Rebecca Davis saw Plaintiff on April 10, 2018.  Doc. 83-1 at 6; Doc. 87 at 2. She noted Plaintiff had a full range of motion with his shoulder but complained of pain. Doc. 83-1 at 6; Doc. 87 at 2.  Nurse Davis noted Plaintiff had been taking ibuprofen and naproxen for his shoulder, as well as using analgesic cream.  Doc. 83-1 at 6; Doc. 87 at 2.  After consulting with Dr. Augustin, Nurse Davis submitted a bottom bunk profile for Plaintiff. Doc. 83-1 at 6; Doc. 87 at 2.

Plaintiff alleges he submitted another HSRF on April 21, 2018, complaining of pain in his right shoulder.  Doc. 83-1 at 6; Doc. 87 at 2.  Nurse Davis saw Plaintiff again on April 24, 2018.  Doc. 83-1 at 6; Doc. 87 at 2.  Plaintiff complained to the nurse his shoulder pain had worsened, but Plaintiff's shoulder had full range of motion.  Doc. 83-1 at 6; Doc. 87 at 2.  Nurse Davis notes state "no swelling or redness noted."  Doc. 83-1 at 6; Doc. 87 at 2.  Nurse Davis

consulted with Dr. Augustin, and Plaintiff was ordered an x-ray and 600 mg of ibuprofen for 30 days.  Doc. 83-1 at 6; Doc. 87 at 2.  Plaintiff received an x-ray of his right shoulder that same day.  Doc. 83-1 at 6; Doc. 87 at 2.  The impression of the report was a "normal right shoulder." Doc. 83-1 at 7; Doc. 87 at 2.

On June 11, 2018, Plaintiff threw a soccer ball on the yard, which he alleges caused his shoulder to slide out of place.  Doc. 83-1 at 7; Doc. 87 at 2.  Plaintiff was able to move his arm and it immediately went back in place.  Doc. 83-1 at 7; Doc. 87 at 2.  Angus Barefoot saw Plaintiff on the same day.  Doc. 83-1 at 7; Doc. 87 at 2.  Nurse Barefoot noted no visible swelling and no other abnormalities.  Doc. 83-1 at 7; Doc. 87 at 2.  Nurse Barefoot consulted with Dr. Augustin, who ordered Plaintiff another 600 mg of ibuprofen, another x-ray, and a follow-up appointment.  Doc. 83-1 at 7; Doc. 87 at 2.

The following day, June 12, 2018, another x-ray was performed.  Doc. 83-1 at 7; Doc. 87 at 2.  The report noted, "No fracture, bone lesion, or dislocation.  The upper chest demonstrates no acute findings.  Normal soft tissue contours.  Normal bone mineralization."  Doc. 83-1 at 7; Doc. 87 at 2.  The impression of the x-ray was "[n]o acute findings[,] [n]o evidence of scapula fracture[, and no] significant soft tissue findings."  Doc. 83-1 at 7; Doc. 87 at 2.

Plaintiff was seen the following day, June 13, 2018, by Nurse Davis complaining his shoulder was "weak," "bothering" him, and felt like it "want[ed] to come out of its socket." Doc. 83-1 at 7; Doc. 87 at 2.  After Nurse Davis consulted with Dr. Augustin, Plaintiff was scheduled for a follow-up appointment with a medical provider.  Doc. 83-1 at 7; Doc. 87 at 2. Plaintiff was prescribed pain medication and an arm sling, though Plaintiff refused the pain medication because he claimed it did not help.  Doc. 83-1 at 8; Doc. 87 at 2.

Dr. Augustin saw Plaintiff five days later on June 18, 2018.  Doc. 83-1 at 8; Doc. 87 at 2.

Dr. Augustin noted the x-ray findings were normal and Plaintiff's shoulder had no deformity, no

swelling, and no gross sensory or motor deficit.  Doc. 83-1 at 8; Doc. 87 at 2.  Dr. Augustin

offered Plaintiff Motrin and naproxen, but Plaintiff refused.  Doc. 83-1 at 8; Doc. 87 at 2.  Dr.

Augustin ordered Plaintiff to follow-up as needed.  Doc. 83-1 at 8; Doc. 87 at 2.

After June 18, 2018, Plaintiff did not go to medical for a year.  Doc. 83-1 at 8; Doc. 87 at

2.  Plaintiff alleges he did have another instance where his right shoulder slid out of place, but he

did not go to the medical department because he did not think the medical unit would help.

Doc. 83-1 at 8; Doc. 87 at 2.  Plaintiff did apply for a bottom bunk profile in March 2019, which

was granted on the same day.  Doc. 83-1 at 8; Doc. 87 at 2.

On June 13, 2019, Plaintiff saw Nurse Davis about his right shoulder.  Doc. 83-1 at 8;

Doc. 87 at 2.  She offered Plaintiff pain medication and an arm sling, which Plaintiff refused.

Doc. 83-1 at 8; Doc. 87 at 2.  Plaintiff was referred to Dr. Augustin as a result of that

appointment, and Plaintiff saw him on June 25, 2019.  Doc. 83-1 at 8; Doc. 87 at 2.  Dr.

Augustin noted Plaintiff had no swelling or deformity of his right shoulder.  Doc. 83-1 at 8;

Doc. 87 at 2.  However, Dr. Augustin prescribed Plaintiff four weeks of physical therapy, which

Plaintiff completed without issue.  Doc. 83-1 at 8; Doc. 87 at 2.  Plaintiff states in his deposition

the physical therapy only alleviated his pain for a couple of hours each session.  Doc. 83-3 at 19.

On September 12, 2019, Plaintiff saw Nurse Davis, who noted Plaintiff complained about

his shoulder.  Doc. 83-1 at 9; Doc. 87 at 2.  Nurse Davis consulted with a medical provider

named Keene, who ordered Plaintiff an arm sling and scheduled Plaintiff for an appointment

with a provider.  Doc. 83-1 at 9; Doc. 87 at 2.  On September 23, 2018, Plaintiff was seen in the

medical department by Advanced Practical Nurse Ronald Macy.  Doc. 83-1 at 9; Doc. 87 at 2.

Plaintiff only wore his arm sling when his shoulder was bothering him, and—because Plaintiff's shoulder had been feeling better in the days prior to the appointment—Plaintiff did not wear his arm sling to the appointment.  Doc. 83-1 at 9; Doc. 87 at 2.  Plaintiff told Mr. Macy he had aggravated his shoulder months prior to this September 2019 appointment doing "mountain climber" exercises.  Doc. 83-1 at 9; Doc. 87 at 2.  Mr. Macy noted Plaintiff may have had a partial tear of his rotator cuff.  Doc. 83-1 at 9; Doc. 87 at 2.  Mr. Macy's treatment plan for Plaintiff included educating Plaintiff on stretches and exercises for his shoulder and counseling Plaintiff to avoid high impact exercises.  Doc. 83-1 at 9; Doc. 87 at 2.  Plaintiff states he asked about an MRI, but Mr. Macy did not discuss the issue.  Doc. 83-3 at 20.  Mr. Macy's notes do not reflect any need for an MRI consult or referral.  Doc. 83-1 at 9; Doc. 87 at 2.

Plaintiff did not return to the medical department again regarding his shoulder until February 2019.  Doc. 83-1 at 9–10; Doc. 87 at 2.  Plaintiff alleges when he was showering, he felt like his shoulder wanted to come out of place and that while putting things away after his shower, his shoulder slipped out of place.  Doc. 83-1 at 10; Doc. 87 at 2.  Plaintiff was scheduled for an x-ray, which was performed on February 13, 2020.  Doc. 83-1 at 10; Doc. 87 at 2.  According to the x-ray report, which was compared with Plaintiff's April 24, 2018 x-ray, Plaintiff's shoulder had "[n]o fracture, bone lesion, or dislocation.  The clavicle and the acromioclavicular joint appear[ed] intact.  The upper chest demonstrates no acute findings.  Normal soft tissue contours.  Normal bone mineralization."  Doc. 83-1 at 10; Doc. 87 at 2.  The impression of the x-ray was "[n]o acute findings. No evidence of fracture.  No significant soft tissue findings."  Doc. 83-1 at 10; Doc. 87 at 2.

Defendants Audra Johnson, Kimberly Bell, Dana Cox, Alicia Hyers, and Deborah Stewart are either registered nurses or licensed practical nurses.  Doc. 83-1 at 10; Doc. 87 at 2.

Registered nurses and licensed practical nurses are not typically responsible for making decisions regarding whether a patient can be sent out of the facility for an MRI.  Doc. 83-1 at 10; Doc. 87 at 2.  These nurse Defendants responded to Plaintiff's HSRFs, set up Plaintiff's appointments, and had Plaintiff come to sick call when appropriate.  Doc. 83-1 at 10–11; Doc. 87 at 2.  The nurse Defendants had to consult with a provider of a higher level before treating Plaintiff, giving him medication, or scheduling him a follow-up appointment.  Doc. 83-1 at 11; Doc. 87 at 2.  The nurse Defendants did not have authority to order Plaintiff an off-site MRI.  Doc. 83-1 at 11; Doc. 87 at 2.  Defendant Stewart is a registered nurse and did not have the authority to order Plaintiff an MRI, notwithstanding her role as Health Services Administrator.  Doc. 83-1 at 11; Doc. 87 at 2.  Defendant Deborah Stewart never personally treated Plaintiff for any of his shoulder issues.  Doc. 83-1 at 11; Doc. 87 at 2.

## II.    Nonmedical Defendants

Plaintiff alleges Nonmedical Defendants were deliberately indifferent to his medical needs when they failed to order medical staff members to treat his shoulder injury.  Doc. 80 at 2; Doc. 86 at 2.  Defendant Stone is an Assistant Warden at CCF.  Doc. 80 at 2; Doc. 86 at 2.  Defendant Stone relies on medical professionals for both information and medical decisions regarding prisoners' medical care.  Doc. 80 at 2; Doc. 86 at 2.  Defendant Stone had no involvement with Plaintiff's disagreements with medical staff other than through the grievance process.  Doc. 80 at 3; Doc. 86 at 2.

Defendant Hall is a former Warden at CCF.  Doc. 80 at 2; Doc. 86 at 2.  Defendant Hall relied on medical professionals for both information and medical decisions regarding prisoners' medical care.  Doc. 80 at 2; Doc. 86 at 2.  Defendant Hall asserts in his declaration he had no independent knowledge of Plaintiff's condition and did not review Plaintiff's medical records.

Doc. 80-1 at 2.  Hall also asserts the only time he would see any medical information on an inmate would be in the course of addressing inmate grievances.[4]  Id.

Nonmedical Defendants assert both Stone and Hall had no medical training.  Doc 80 at 2–3.  Plaintiff disputes this assertion but only based on the fact Stone and Hall had some CPR training.  Doc. 86 at 2.

## DISCUSSION

### I.     Legal Standard

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, there must exist a conflict in substantial evidence to pose a jury question."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).  "If the evidence [produced by the nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249 (1986) (citations omitted).

---

[4]     Nonmedical Defendants rely on Hall's declaration but do not specifically reproduce these portions of Hall's declaration in their Statement of Material Facts.  Doc. 80 at 2.  Regardless, Plaintiff addresses Hall's declaration in his Response and provides his own "Declaration of Disputed Material Facts."  At no time does Plaintiff suggest these statements in Hall's declaration are disputed.  Indeed, it is clear Plaintiff agrees Hall's only involvement in Plaintiff's medical care was that of a supervising warden at the facility.  Doc. 86 at 2 (Plaintiff stating, "I know that Defendants Hall and Stone did not create policies related to providing me adequate medical treatement; but Defendants Hall and Stone were responsible for correcting written or unwritten policies or proceedures that prevented me from receiving adequeate medical care, even if the medical personal were not directly under their supervision, because it is part of their jobs as wardens.").

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.  See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)).  Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the non-moving party to come forward with specific facts showing a genuine dispute for trial.  Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2019).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011).

## II.    Medical Defendants

In his Second Amended Complaint, Plaintiff claims Medical Defendants failed to provide adequate diagnosis and treatment for his dislocated shoulder.  Doc. 90 at 14.  Plaintiff acknowledges Medical Defendants provided him with numerous appointments and treatments for his shoulder, but he asserts Medical Defendants should have done more than prescribe pain medication, order x-rays, and provide physical therapy which failed to help him.  Id.  Plaintiff claims Medical Defendants should have instead given him an MRI, an outside consult with an

orthopedic doctor, and more effective physical therapy.  Id.  Plaintiff does not state when in his course of treatment these things should have occurred.

Plaintiff also alleges Medical Defendants conspired together to carry out written and unwritten policies, customs, and practices that violated his Eighth Amendment rights.  Id. at 21–22.  Plaintiff alleges Defendants Stewart and Augustin witnessed their subordinates, Arebeck, Davis, Hyers, Cox, Johnson, Nagy, and Bell, violate his constitutional rights.[5]  Id.

### A.     Legal Standard

The United States Supreme Court has interpreted the Eighth Amendment Cruel and Unusual Punishment Clause to prohibit "deliberate indifference to serious medical needs of prisoners."  Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)).  To prove a deliberate indifference to medical treatment claim, a plaintiff must demonstrate: (1) a serious medical need; (2) deliberate indifference to the need; and (3) a causal connection between the constitutional violation and plaintiff's injury.  Id.  The first element is an objective inquiry.  Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).  A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. (quotation and citation omitted).

---

[5]     In his Second Amended Complaint, Plaintiff added Nurse Davis as a Defendant.  Doc. 90 at 5. Plaintiff asserts nearly identical claims against Nurse Davis as the other nurse Defendants.  Id.  The Court did not address the additional claims Plaintiff asserts against Nurse Davis when conducting frivolity review of Plaintiff's Second Amended Complaint.  Doc. 91.  Because Nurse Davis was never added as a Defendant to the docket, Nurse Davis was never served with Plaintiff's Second Amended Complaint. Additionally, it appears service of Nurse Arebeck was never completed.  Doc. 25.  However, the claims against Nurse Davis and Nurse Arebeck and legal bases for these claims are identical to the other nurse Defendants.  Therefore, Davis and Arebeck are entitled to summary judgment in their favor for the same reasons the other nurse Defendants are entitled to summary judgment.

The second element is a subjective inquiry.  Id.  To show defendants' deliberate indifference, a plaintiff must prove: "(1) subjective knowledge of a risk of serious harm; (2) a disregard of that risk; (3) by conduct that is more than mere negligence."  Melton, 841 F.3d at 1223.  Conduct that is more than mere negligence can include grossly inadequate care, a decision to take a less effective but easier course of treatment, or completely cursory medical care that amounts to no treatment at all.  Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011).  A mere medical malpractice claim does not constitute deliberate indifference to a serious medical need.  Estelle, 429 U.S. at 104.

Medical prison officials are entitled to utilize their medical judgment when treating inmates.  See Estelle, 429 U.S. at 107.  Accordingly, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" also does not amount to a constitutional violation.  Melton, 841 F.3d at 1224 (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).  Prison officials cannot be held liable under the Eighth Amendment when they provide an inmate with treatment, but the inmate simply prefers a different mode or method of treatment.  Sifford v. Ford, 701 F. App'x 794, 795 (11th Cir. 2017).  Relatedly, the ordering of diagnostic tests, such as x-rays and MRIs, is a "classic example of a matter for medical judgment."  Id. at 796 (quoting Estelle, 429 U.S. at 107).

**B.     Analysis**

Medical Defendants argue Plaintiff cannot prove any of the necessary elements for a deliberate indifference claim.  First, Medical Defendants assert Plaintiff's injury did not constitute an objectively serious medical need because the evidence shows he did not dislocate his shoulder.  Doc. 83-2 at 18–20.  In support, Defendants point to the x-ray reports, which all showed Plaintiff did not suffer from a serious shoulder injury, such as a dislocation.  Docs. 83-4,

14

83-5, 83-6.  They also produce a declaration from Dr. Augustin in which he states he has diagnosed Plaintiff with myalgia.  Doc. 83-7 at 3.  Medical Defendants also argue Plaintiff did not find his own injury serious because he continued to engage in aggravating activities, despite being warned not to do so.  Doc. 83-2 at 19–20.  Second, Medical Defendants argue they did not subjectively act with deliberate indifference because they treated his injury appropriately.  Id. at 20–21.  Medical Defendants assert they developed an appropriate course of treatment for Plaintiff after seeing him on 16 different occassions, which included multiple types of pain medication, bottom bunk profiles, arm slings, physical therapy, and counseling on exercises to help his shoulder and what activities to avoid.  Id. at 20.  Medical Defendants again point to Dr. Augustin's declaration, which discusses Plaintiff's medical treatment.  Doc. 83-7 at 3.  Medical Defendants assert Plaintiff cannot show a causal connection because he cannot point to any evidence Medical Defendants' actions or inaction made his injury worse.  Id. at 21–22. Defendants argue any additional issues with his shoulder were a result of his own actions, against which he was counseled.  Id.

In response, Plaintiff argues the evidence shows he did dislocate his shoulder.  Doc. 87 at 3.  Plaintiff points to a handful of medical records to support this assertion.  Doc. 87-1 at 1–5. These records surround Plaintiff's initial visit for his shoulder on December 6, 2016.  Id.  In the assessment sections, Nurse Kyla Hand notes the "right arm bone feels to be slightly (approx. 0.5in) out of right shoulder socket . . . ."  Doc. 87-1 at 2, 4.  In the plan section she states, "Referred to NP M. McLeod.  Shoulder concluded to be dislocated.  Gentle closed reduction was successfully performed."  Id. at 4.  A later progress note states the reason for visit as "[p]ossible dislocated shoulder."  Id. at 5.  The treatment plan developed was ibuprofen, an arm sling, a bottom bunk profile, and counseling Plaintiff.  Id. at 4.

It is undisputed Plaintiff suffered from a painful shoulder injury, but the parties dispute whether Plaintiff actually dislocated his shoulder.  Viewing the evidence in the light most favorable to Plaintiff, the Court assumes Plaintiff dislocated his shoulder for purposes of its summary judgment analysis.  A dislocated shoulder could potentially be considered a serious medical need.  See Monfiston v. Wetterer, No. 215CV662FTM38MRM, 2020 WL 1476183, at *4 (M.D. Fla. Mar. 25, 2020) (discussing broken arm and dislocated wrist as serious medical needs); Mapp v. Williams, No. 5:16-CV-56, 2018 WL 894568, at *4 (S.D. Ga. Feb. 14, 2018) (finding hip dislocation serious medical need); Jackson v. Cherry, No. 5:13-CV-284, 2014 WL 6909407, at *5 (N.D. Fla. Dec. 9, 2014) (suggesting subluxation and dislocation of thumb is a serious medical need).  However, the Court need not resolve whether Plaintiff did, in fact, have a serious medical need because Plaintiff has not created a genuine dispute for trial as to the second and third elements of a deliberate indifference claim.

Plaintiff has not shown Medical Defendants were subjectively deliberately indifferent to his shoulder injury.  Plaintiff does not dispute Medical Defendants developed a course treatment for his injury.  Doc. 83-1 at 11; Doc. 87 at 2.  Plaintiff does not dispute he had multiple visits with medical staff and that after every appointment, some sort of treatment was prescribed.  Further, Plaintiff does not dispute he received physical therapy on several occasions.  Doc. 83-1 at 8; Doc. 87 at 2; Doc. 83-3 at 19.

Given these undisputed facts, Plaintiff cannot show an Eighth Amendment violation.  Plaintiff received medical care for his injury on 16 different occasions.  The sheer amount and different types of treatment offered by Medical Defendants indicate Plaintiff's claim is simply not one the Eighth Amendment Cruel and Unusual Punishment Clause contemplates.  Medical Defendants provided Plaintiff with some form of treatment on nearly every occasion he

requested it.  At summary judgment, Plaintiff has not produced any evidence showing an MRI or

visit with a specialist were necessary.  With little to no evidence presented by Plaintiff, his claim

solely rests on his personal belief he should have received an MRI, a consult with an outside

specialist, and a more effective form of physical therapy.  Requesting an MRI is a "classic

example of a matter for medical judgment."  Sifford, 701 F. App'x at 795 (quoting Estelle, 429

U.S. at 107).  Plaintiff's assertions he should have received a consult with a specialist and more

effective physical therapy are merely disagreements with the course of treatment developed by

Medical Defendants, which does not violate the Eighth Amendment.  Id.; Melton, 841 F.3d at

1224.  The fact Plaintiff does not dispute he received physical therapy on several occasions

reveals he is simply dissatisfied with the type of treatment offered.  Doc. 83-1 at 8; Doc. 87 at 2;

Doc. 83-3 at 19.  Even assuming Plaintiff dislocated his shoulder and Medical Defendants

misdiagnosed his injury, his claim at most amounts to a medical malpractice claim, which also

does not violate the Eighth Amendment.  Estelle, 429 U.S. at 104.

Additionally, Plaintiff has not offered any evidence that would suggest a causal

connection between Medical Defendants' allegedly unconstitutional actions and his shoulder

injury, much less create a question of fact to be tried to a jury.  Plaintiff does not dispute his own

actions, taken against medical advice, aggravated his shoulder injury.  Doc. 83-1 at 2, 7, 9;

Doc. 87 at 2.  Plaintiff has not produced any evidence or provided any argument explaining how

Medical Defendants' actions caused him additional harm.  Doc. 87.  Plaintiff has not

demonstrated, for example, his shoulder injury is any worse than it was when he first came in for

his initial appointment in December 2016.  Id.  He has not presented evidence demonstrating

how an MRI or consultation with a specialist would have resulted in different treatment or

prevented long-term damage.  Thus, Plaintiff has not created a genuine dispute for trial regarding

his claim against Medical Defendants because he cannot prove two essential elements of an Eighth Amendment violation.

Because Plaintiff cannot show an underlying constitutional violation, Plaintiff's supervisory claims against Defendants Augustin and Stewart also fail.  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1308 (11th Cir. 2009) ("Plaintiffs' claims under a theory of supervisory liability fail because the underlying § 1983 claims fail.").  Plaintiff has also not identified any evidence showing Defendant Stewart personally participated in unconstitutional conduct or a causal connection between Defendant Stewart's actions and her subordinate's allegedly unconstitutional actions.[6]  Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014).

Similarly, Plaintiff's claims against Dr. Augustin and Ms. Stewart in their official capacities as policy makers also fail because Plaintiff has not demonstrated any issue of fact as to his underlying constitutional claims.  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004); Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996).  Even considering Plaintiff's claims, Plaintiff has not presented any evidence of or even pointed to a custom or policy put in place by Defendants Augustin and Stewart.

For these reasons, I **RECOMMEND** the Court **GRANT** Medical Defendants' Motion for Summary Judgment.  Because the Plaintiff has not created a genuine dispute of material fact regarding his Eighth Amendment claim, the Court declines to address Medical Defendants' other arguments in the Motion for Summary Judgment.

---

[6]     Any role Defendant Stewart played in denying Plaintiff's grievance is insufficient alone to impose liability against her.  See, e.g., Williams v. Adkinson, No. 3:17CV184, 2020 WL 982007, at *5 (N.D. Fla. Feb. 7, 2020) (collecting cases); Jones v. Johnson, No. CV611-007, 2011 WL 5024452, at *3 (S.D. Ga. July 18, 2011) ("[T]he rejection of a grievance is not a sufficient basis for liability.").

III.   **Nonmedical Defendants**

Plaintiff's claims against Defendants Hall and Stone concern their supervisory roles as final policy makers at CCF.  Doc. 90 at 19–20.  In his Second Amended Complaint, Plaintiff states Defendants Hall and Stone created and enforced written and unwritten policies, customs, or practices that authorized subordinates to deny Plaintiff medical care.  Id.  Plaintiff claims Defendants Hall and Stone violated his Eighth Amendment rights by witnessing Medical Defendants deny him medical treatment and failing to correct the misconduct.  Id.  Plaintiff also states Defendant Stone denied one of his grievances on June 13, 2017.  Id. at 7.  Plaintiff sues Nonmedical Defendants in their official and individual capacities.  Id. at 4.  Overall, Plaintiff states the deliberate indifference to his medical condition is part of a systemic practice driven by the financial goals of CoreCivic and Correct Care Solutions.  Id. at 14.

A.   **Legal Standard**

Supervisory officials cannot be held vicariously liable under § 1983 for the unconstitutional acts of their subordinates.  Harrison, 746 F.3d at 1298 (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)).  A plaintiff seeking to hold a supervisor liable must show either: (1) the supervisor participated directly in the unconstitutional conduct, or (2) a causal connection exists between the supervisor's actions and the alleged constitutional violation. Id.  A causal connection can be shown by a history of widespread abuse that puts the supervisor on notice of a need to correct or a custom or policy created by a supervisor that results in deliberate indifference to constitutional rights.  Id.  A causal connection can also be shown by facts supporting an inference that the supervisor directed unlawful conduct or "knew the subordinates would act unlawfully and failed to stop them from doing so."  Id.  (quoting Cottone, 326 F.3d at 1360).

The standard for a failure-to-train claim asserted against a supervisor is quite similar.  A plaintiff must produce evidence indicating a policy or custom resulted from a pattern of violations, "such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures . . . and when the failure to train is likely to result in the violation of a constitutional right . . . ."  Belcher v. City of Foley, 30 F.3d 1390, 1398 (11th Cir. 1994).  "In a narrow range of circumstances," a plaintiff may also establish a failure-to-train claim when there is no pattern of previous violations, but the the need for training is so obvious that the violation of constitutional rights is highly predictable.  Connick v. Thompson, 563 U.S. 51, 63 (2011).

**B.      Analysis**

Nonmedical Defendants assert Plaintiff has produced no evidence to support his position that Nonmedical Defendants violated his Eighth Amendment rights.  Doc. 80 at 12.  In part, Nonmedical Defendants argue they did not have the ability to decide or direct a private contractor to take medical action.  Id.  Nonmedical Defendants state they were not equipped by education or training to manage medical care and were entitled to reasonably rely upon medical professionals.  Id.  In addition, Nonmedical Defendants argue they did not create any policies or practices that impacted Plaintiff's medical care.  Id.

Nonmedical Defendants rely on declarations from Defendants Hall and Stone as evidence they had no control over Plaintiff's medical care.  Defendant Hall states he was employed by CoreCivic, Inc. when he was the Warden of CCF.  Doc. 80-1 at 1.  Defendant Hall states he was not allowed to order specific medical care, such as an MRI or outside consult with a specialist.  Id.  If a prisoner was dissatisfied with medical care, a prisoner could file a grievance, but medical staff members provide information so that the grievance coordinator can respond to a grievance.

Id.  Defendant Hall states because he is not a health care professional, he cannot order medical staff to prescribe particular medications or follow a specific course of treatment.  Id. at 2. Further, the medical personnel at issue in this case were employed and supervised by Wellpath, not by his organization.  Id. at 2.  Plaintiff does not controvert these facts.

In his declaration, Defendant Stone states he was also employed by CoreCivic, Inc. as Assistant Warden at CCF.  Doc. 80-2 at 3.  Although Defendant Stone reviewed grievances as part of his job, he relied on medical staff members to report to the grievance coordinator on medical issues.  Id.  Defendant Stone states Plaintiff submitted three medical grievances that were denied based on information provided by medical staff.  Id. at 4.  Defendant Stone says he had no authority to order medical personnel to provide the medical care Plaintiff requested.  Id. Defendant Stone states he did not draft or create any medical policies on how to treat patients. Id. at 5.  Under CoreCivic policy 13-77, general health care policies were created at the corporate level.  Id.  Again, Plaintiff does not controvert these facts.

In his Response, Plaintiff argues a causal connection exists between Defendant Stone and Hall's conduct and his constitutional deprivation because they were made aware of his medical issues through the grievance process.[7]  Doc. 86 at 7.  Plaintiff states, "[T]hey chose to follow the company's unwritten directive to deny Plaintiff's grievances without performing an adequate investigation into whether medical staff provided him with adequate medical care."  Id.  As evidence, Plaintiff relies on his own declaration.  Id. at 4–5.  In the declaration, he largely discusses the medical treatment he did receive and various HSRFs and grievances he filed rather than discussing any specific actions taken by Nonmedical Defendants.  Id.  He also states,

---

[7]     The record does not show Defendant Hall ever denied or participated in reviewing Plaintiff's grievances.  Defendant Stone did review and deny grievances submitted by Plaintiff.

> I know that Defendants Hall and Stone did not create policies related to providing me adequate medical treatment; but Defendants Hall and Stone were responsible for correcting written or unwritten policies or procedures that prevented me from receiving adequate medical care, even if the medical personell [sic] were not directly under their supervision, because it is part of their jobs as wardens.

Id. at 5.  Plaintiff also relies on medical records relating to treatment he received for his shoulder injury.  Doc. 86-1 at 1–5.  While these records indicate Plaintiff may have dislocated his shoulder, the records do not mention Defendants Hall or Stone or demonstrate Hall or Stone were involved in any way with Plaintiff's medical care.  See id.

There is no genuine dispute of any material fact on these claims that would preclude judgment in favor of Nonmedical Defendants.  A reasonable jury simply could not find—based on the evidence submitted to the Court—that Nonmedical Defendants violated Plaintiff's Eighth Amendment rights.  Plaintiff cannot show Defendants Hall and Stone personally participated in denying his Eighth Amendment rights, nor does he appear to assert such a claim.  Harrison, 746 F.3d at 1298.  Plaintiff cannot show a causal connection between Defendant Hall and Stone's conduct and the deprivation of his constitutional rights.  Id.  As discussed above, Plaintiff concedes in his declaration Defendants Hall and Stone did not create policies relating to his medical treatment.  Doc. 86 at 5.  Plaintiff has failed to identify any specific policy, custom, or practice that resulted in any deprivation of medical care.  Plaintiff has also not produced evidence of widespread abuse that would have put Defendants Hall and Stone on notice of a need to correct existing customs or policies.  Harrison, 746 F.3d at 1298.  Nor has Plaintiff produced evidence Defendants Hall or Stone directed unlawful conduct or knew Medical Defendants acted unlawfully.  Id.  Plaintiff admits Medical Defendants were not under Nonmedical Defendants' supervision.  Doc. 86 at 5.  Plaintiff's claim against Defendants Hall and Stone as supervisors essentially amount to a claim they "should have known."  This is not sufficient to maintain a

§ 1983 claim against a supervisor, especially an Eighth Amendment claim.  Harrison, 746 F.3d at 1298.  Plaintiff has likewise not submitted any evidence to support any inadequate training claim against Nonmedical Defendants because he has not identified any widespread pattern of constitutional violations or an obvious need for training.  Belcher, 30 F.3d at 1398; Connick, 563 U.S. at 63.

Additionally, Defendant Stone's role in denying Plaintiff's grievances is insufficient to show a constitutional violation.  Plaintiff does not dispute Defendant Stone's involvement with his medical issues was limited to reviewing and denying his grievances.  Doc. 80 at 3; Doc. 86 at 2.  The mere denial of a grievance without personal participation in the underlying unconstitutional conduct does not establish § 1983 liability.  See, e.g., Williams v. Adkinson, No. 3:17CV184, 2020 WL 982007, at *5 (N.D. Fla. Feb. 7, 2020) (collecting cases); Jones v. Johnson, No. CV611-007, 2011 WL 5024452, at *3 (S.D. Ga. July 18, 2011) ("[T]he rejection of a grievance is not a sufficient basis for liability.").

As discussed above, Plaintiff's claims against Medical Defendants fail.  Thus, Plaintiff cannot maintain claims against Nonmedical Defendants based on their alleged supervision when Plaintiff cannot prove an underlying Eighth Amendment violation.  Mann, 588 F.3d at 1308.  Because Plaintiff has not identified any genuine dispute of material fact relating to his claims against Nonmedical Defendants, the Court declines to address Nonmedical Defendants remaining argument, namely whether Plaintiff exhausted his administrative remedies.[8]  For these

---

[8]     Although the Court will not consider Nonmedical Defendants' exhaustion argument at this time, it does note the argument relies, in part, on a flawed premise—namely, Plaintiff was required to specifically name them in his grievance.  Exhaustion is not per se inadequate simply because the prisoner failed to specifically name a defendant.  Jones v. Bock, 549 U.S. 199, 217–19 (2007).

reasons, I **RECOMMEND** the Court **GRANT** Nonmedical Defendants' Motion for Summary Judgment.

## IV.     Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.  Though Plaintiff has not yet filed a notice of appeal, it is proper to address these issues at this time.  See Fed. R. App. P. 24(a)(3) (trial court may certify appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).  An *in forma pauperis* action is frivolous and not brought in good faith if it is "without arguable merit either in law or fact."  Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's claims and Defendants' Motions for Summary Judgment, there are no non-frivolous issues to raise on appeal, and an appeal on these claims would not be taken in good faith.  Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

**CONCLUSION**

For the reasons set forth above, I **RECOMMEND** the Court **GRANT** Defendants'

Motions, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment,

and **DENY** Plaintiff leave to proceed *in forma pauperis* on appeal.

Any objections to this Report and Recommendation shall be filed within 14 days of

today's date.  Objections shall be specific and in writing.  Any objection that the Magistrate

Judge failed to address a contention raised in the Complaint must be included.  Failure to file

timely, written objections will bar any later challenge or review of the Magistrate Judge's factual

findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't

Station #4, No. 17-11264, 2020 WL 6039905, at *4 (11th Cir. Oct. 13, 2020).  To be clear, a

party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions

on appeal by failing to file timely, written objections.  Harrigan, 2020 WL 6039905, at *4; 11th

Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United

States District Judge will make a de novo determination of those portions of the report, proposed

findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 26th day of February, 2021.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA